**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order.

United States Courts
Southern District of Texas
F I L E D

**MAR 0 4 2019**

David J. Bradley, Clerk of Court

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | |
| | § | CRIMINAL NO. **19 CR   147** |
| CYRUS ALLEN AHSANI, and | § | |
| SAMAN AHSANI, | § | **UNDER SEAL** |
| | § | |
| Defendants. | § | |

## INFORMATION

THE UNITED STATES CHARGES:

At all relevant times, unless otherwise specified:

### The Foreign Corrupt Practices Act

1.     The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

### The Defendants, Intermediary Company, and Associated Individuals

2.     "Intermediary Company," a Monaco-based group of affiliated companies whose identities are known to the United States and the Defendants, provided services for various multinational companies operating in the energy

sector.  Intermediary Company maintained business operations through its various

subsidiaries and affiliates in multiple countries, including in Algeria, Angola,

Azerbaijan, Iraq, Kazakhstan, Libya, the United Arab Emirates, and elsewhere.  At

one point, Intermediary Company and its various subsidiaries and affiliates

employed or retained over 1,400 employees and contractors.  At times,

Intermediary Company, and certain of its various subsidiaries and affiliates, was an

agent of an "issuer," as that term is used in the FCPA, Title 15, United States

Code, Section 78dd-1(a); an agent of a "domestic concern," as that term is used in

the FCPA, Title 15, United States Code, Section 78dd-2(a) and (h)(1); and a

"person" and an agent of a "person," as those terms are used in the FCPA, Title 15,

United States Code, Section 78dd-3(a) and (f)(1).

     3.      Defendant **CYRUS ALLEN AHSANI** ("Defendant **C. AHSANI**")

was a citizen of the United Kingdom and Iran, and, until on or about July 1, 2011,

a citizen of the United States.  In or around 1991, Defendant **C. AHSANI** became

an executive at Intermediary Company.  In or around 1994, Defendant

**C. AHSANI** became the Chief Executive Officer ("CEO") of Intermediary

Company, a position he held until at least 2016.  Until on or about July 1, 2011,

Defendant **C. AHSANI** was a "domestic concern" and a "United States Person," as

those terms are used in the FCPA, Title 15, United States Code, Section

78dd-2(h)(1)(A), (i)(2).  At various times, Defendant **C. AHSANI** was an agent of

2

an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a); an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(a) and (h)(1); and a "person" and an agent of a "person," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

4.     Defendant **SAMAN AHSANI** ("Defendant **S. AHSANI**"), was a citizen of the United Kingdom and Iran.  In or around 2003, Defendant **S. AHSANI** became an employee of Intermediary Company.  In or around 2005, Defendant **S. AHSANI** became Intermediary Company's Commercial Director and Libya Territory Manager, a position he held until at least 2011.  In or around 2011, Defendant **S. AHSANI** became Intermediary Company's Chief Operations Officer ("COO"), a position he held until at least 2016.  At various times, Defendant **S. AHSANI** was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a); an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(a) and (h)(1); and a "person" and an agent of a "person," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

5.     "CC-1," an individual whose identity is known to the United States and the Defendants, was a citizen of the United Kingdom and Iran.  CC-1 was a senior executive of Intermediary Company.  At various times, CC-1 was an agent

3

of an "issuer," as that term is used in the FCPA, Title 15, United States Code,
Section 78dd-1(a); an agent of a "domestic concern," as that term is used in the
FCPA, Title 15, United States Code, Section 78dd-2(a) and (h)(1); and a "person"
and an agent of a "person," as those terms are used in the FCPA, Title 15, United
States Code, Section 78dd-3(a) and (f)(1).

6.      "CC-2," an individual whose identity is known to the United States
and the Defendants, was a citizen of the United Kingdom and an employee of
Intermediary Company.  At various times, CC-2 was an agent of an "issuer," as
that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a); an
agent of a "domestic concern," as that term is used in the FCPA, Title 15, United
States Code, Section 78dd-2(a) and (h)(1); and a "person" and an agent of a
"person," as those terms are used in the FCPA, Title 15, United States Code,
Section 78dd-3(a) and (f)(1).

7.      "CC-3," an individual whose identity is known to the United States
and the Defendants, was a citizen of the United Kingdom and a business partner of
Intermediary Company.  At various times, CC-3 was an agent of an "issuer," as
that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a); an
agent of a "domestic concern," as that term is used in the FCPA, Title 15, United
States Code, Section 78dd-2(a) and (h)(1); and a "person" and an agent of a

4

"person," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

8.      "CC-4," an individual whose identity is known to the United States and the Defendants, was a citizen of the United Kingdom and an employee of Intermediary Company.  At various times, CC-4 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a); an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(a) and (h)(1); and a "person" and an agent of a "person," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

9.      "CC-5," an individual whose identity is known to the United States and the Defendants, was a citizen of the United States and a business partner of Intermediary Company.  CC-5 was a "domestic concern" and a "United States Person," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A), (i)(2).  At various times, CC-5 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a); an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(a) and (h)(1); and an agent of a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

10.    "CC-6," an individual whose identity is known to the United States and the Defendants, was a citizen of Italy and a business partner of Intermediary Company.  At various times, CC-6 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a); an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(a) and (h)(1); and a "person" and an agent of a "person," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

11.    "CC-7," an individual whose identity is known to the United States and the Defendants, was a citizen of Iraq.  CC-7 maintained a business relationship with Intermediary Company.  At various times, CC-7 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a); an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(a) and (h)(1); and a "person" and an agent of a "person," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

## The Defendants' Client Companies

12.    Rolls-Royce plc ("Rolls-Royce") was a publicly traded company in the United Kingdom.  Rolls-Royce was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a), (f)(1).  From in or around

6

2000 to in or around 2014, Rolls-Royce Energy Systems, Inc. ("RRESI") was an Ohio-based subsidiary of Rolls-Royce. RRESI was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

13.    SBM Offshore N.V ("SBM") was a publicly-traded company in the Netherlands, with offices in Amsterdam, Monaco, Switzerland and Houston, Texas, and subsidiaries in Houston, Texas. SBM was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a), (f)(1).

14.    "Company 1," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company headquartered in Houston, Texas, whose shares were traded on the New York Stock Exchange. Company 1 was an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

15.    "Company 2," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company headquartered in New Jersey, whose shares were traded on the New York Stock Exchange. Company 2 was an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

16.    "Company 3," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational energy company headquartered in Houston, Texas, whose shares were traded on the New York

7

Stock Exchange. Company 3 was an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

17. "Company 4," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational energy company headquartered in Houston, Texas, whose shares were traded on the New York Stock Exchange. Company 4 was an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

18. "Company 5," an entity whose identity is known to the United States and the Defendants, was an Italy-based company that was a wholly owned subsidiary of a publicly traded multinational energy company, which was headquartered in Massachusetts and whose shares were traded on the New York Stock Exchange. Company 5 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(a).

19. "Company 6," an entity whose identity is known to the United States and the Defendants, was a multinational energy company headquartered in Houston, Texas whose shares were traded on the New York Stock Exchange. Company 6 was an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

20. "Company 7," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational energy company

8

headquartered in the United Kingdom. Company 7 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

21.     "Company 8," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company headquartered in Australia. Company 8 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

22.     "Company 9," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company headquartered in Italy. Company 9 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

23.     "Company 10," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company headquartered in Malaysia. Company 10 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

24.     "Company 11," an entity whose identity is known to the United States and the Defendants, was a multinational construction company headquartered in South Korea. Company 11 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

25.     "Company 12," an entity whose identity is known to the United States and the Defendants, was a multinational construction company headquartered in

9

South Korea.  Company 12 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

26.  "Company 13," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company headquartered in Norway.  Company 13 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

27.  "Company 14," an entity whose identity is known to the United States and the Defendants, was a partnership of two multinational energy companies headquartered in Turkey.  Company 14 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

28.  "Company 15," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company headquartered in South Korea.  Company 15 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

29.  "Company 16," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company headquartered in South Korea.  Company 16 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

30.  "Company 17," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company

headquartered in Spain.  Company 17 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

31.   "Company 18," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational original equipment manufacturing company headquartered in Germany.  Company 18 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

32.   "Company 19," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company headquartered in Singapore.  Company 19 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

33.   "Company 20," an entity whose identity is known to the United States and the Defendants, was a publicly traded multinational engineering company headquartered in Italy.  Company 20 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

34.   "Company 21," an entity whose identity is known to the United States and the Defendants, was a multinational energy company headquartered in Switzerland whose shares had sponsored American Depositary Shares publicly traded on the New York Stock Exchange.  Company 21 was an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

11

35.    "Company 22," an entity whose identity is known to the United States and the Defendants, was a privately owned chemical and engineering company, headquartered in Houston, Texas. Company 22 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

36.    "Company 23," an entity whose identity is known to the United States and the Defendants, was a privately owned engineering company headquartered in New York. Company 23 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

37.    "Company 24," an entity whose identity is known to the United States and the Defendants, was a multinational energy company headquartered in Missouri whose shares were traded on the New York Stock Exchange. Company 24 was an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a). In or around June 2010 Company 24 acquired Company 23.

38.    "Company 25," an entity whose identity is known to the United States and the Defendants, was a privately owned maintenance company headquartered in Monaco. Company 25 was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).[1]

---

[1] At times, Companies 1-25 operated through various subsidiaries and affiliates. As used below, the designation for the parent company, e.g., "Company 1," may refer to subsidiaries or affiliates of that company.

## Foreign Instrumentalities

39.    "SOE-1," an entity whose identity is known to the United States and
the Defendants, was an Iraqi state-owned and state-controlled oil company that
performed government functions for Iraq, and was an "instrumentality" of the
government, as that term is used in the FCPA, Title 15, United States Code,
Sections 78dd-1(a); 78dd-2(a); and 78dd-3(a).

40.    "SOE-2," an entity whose identity is known to the United States and
the Defendants, was an Iraqi state-owned and state-controlled oil company that
performed government functions for Iraq, and was an "instrumentality" of the
government, as that term is used in the FCPA, Title 15, United States Code,
Sections 78dd-1(a); 78dd-2(a); and 78dd-3(a).

41.    "SOE-3," an entity whose identity is known to the United States and
the Defendants, was a Kazakh state-owned and state-controlled oil and gas
company that performed government functions for Kazakhstan, and was an
"instrumentality" of the government, as that term is used in the FCPA, Title 15,
United States Code, Sections 78dd-1(a); 78dd-2(a); and 78dd-3(a).

42.    "SOE-4," an entity whose identity is known to the United States and
the Defendants, was a subsidiary of an Italian oil and gas company that was
nominated by the government of Kazakhstan to act on behalf of SOE-3 as the
operator of "Kazakhstan Project 1," a major oil and gas project in Kazakhstan,

13

whose identity is known to the United States and Defendants.  In this capacity, SOE-4 was authorized to help determine contract awards for Kazakhstan Project 1 and was an "instrumentality" of the government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(a); 78dd-2(a); and 78dd-3(a).

43.    "SOE-5," an entity whose identity is known to the United States and the Defendants, was an Algerian state-owned and state-controlled oil company that performed government functions for Algeria, and was an "instrumentality" of the government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(a); 78dd-2(a); and 78dd-3(a).

44.    "SOE-6," an entity whose identity is known to the United States and the Defendants, was a Libyan state-owned and state-controlled oil company that performed government functions for Libya, and was an "instrumentality" of the government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(a); 78dd-2(a); and 78dd-3(a).

## The Corrupt Scheme

45.    Beginning by at least in or around 1999, and continuing until in or around 2016, Defendants **C. AHSANI** and **S. AHSANI**, while acting within the scope of their employment with Intermediary Company and within the scope of their agency with various companies, including Companies 1-25, and with the intent to benefit Intermediary Company and its client companies, including

14

Companies 1-25, conspired with others, including CC-1, CC-2, CC-3, CC-4, CC-5, CC-6, CC-7, and certain executives and employees of Companies 1-25, to (1) pay bribes, promise to pay bribes, offer to pay bribes, and authorize the payment of bribes to foreign government officials in Iraq, Kazakhstan, Libya, Algeria, Iran, Azerbaijan, Angola, Syria, the Democratic Republic of the Congo, and elsewhere, at government ministries and instrumentalities, including, but not limited to, at SOE-1, SOE-2, SOE-3, SOE-4, SOE-5, and SOE-6, on behalf and for the benefit of Intermediary Company and its client companies, including Companies 1-25, in order to obtain improper business advantages and to obtain and retain business for Intermediary Company and its client companies; (2) launder the proceeds of bribe payments in order to promote and conceal the ongoing bribery schemes; and (3) cause false statements to be made to, and to destroy and conceal documents and records to evade detection from, law enforcement authorities in the United States, the United Kingdom, Italy, and elsewhere.  In furtherance of the conspiracy, Defendants **C. AHSANI** and **S. AHSANI** conspired with others, known and unknown, to engage in "bid-rigging" between certain of its client companies and pay "kickbacks" to employees of certain of its client companies.

<u>Iraq</u>

46.     In Iraq, Defendants **C. AHSANI** and **S. AHSANI** conspired with others, including certain executives and employees at client companies of

15

Intermediary Company, to pay bribes, promise to pay bribes, offer to pay bribes, and authorize the payment of bribes to foreign government officials, including officials at SOE-1 and SOE-2, in order to obtain improper business advantages and to obtain and retain business for Intermediary Company and its client companies, including, but not limited to SBM, Company 1, Company 5, Company 8, Company 9, Company 22, and Company 25.  Defendants **C. AHSANI** and **S. AHSANI** also conspired with others to engage in other corrupt conduct such as bid-rigging, paying kickbacks, and laundering of the proceeds of the corrupt schemes.

47.    For example, beginning in or around January 2008, Defendants **C. AHSANI** and **S. AHSANI**, together with others, including CC-1, CC-2, CC-3, and CC-4, agreed to pay bribes to "Iraq Official 1," a high-ranking official at SOE-1, whose identity is known to the United States and the Defendants, in exchange for Iraq Official 1's agreement to help steer contract awards to Intermediary Company's client companies, including, but not limited to, SBM, Company 1, Company 5, Company 8, Company 9, and Company 25.

48.    In or around May 2009, Defendants **C. AHSANI** and **S. AHSANI**, together with others, including CC-1, CC-3, and CC-4, also agreed to begin paying a monthly bribe to "Iraq Official 2," a high-ranking official at SOE-1 whose identity is known to the United States and the Defendants, in exchange for Iraq Official 2's agreement to provide Intermediary Company's employees with

16

confidential documents and information from SOE-1, and a promise by Iraq

Official 2 to help steer SOE-1 contract awards to Intermediary Company's client

companies, including, but not limited to SBM, Company 1, Company 5, Company

8, and Company 9.

49.     In or around August 2009, Defendants **C. AHSANI** and **S. AHSANI**,

together with others, including, but not limited to, CC-1, CC-2, CC-3, CC-4, and

CC-7 also agreed to begin paying bribes to "Iraq Official 3" and "Iraq

Official 4," two senior Iraqi government officials whose identities are known to the

United States and the Defendants, in order to ensure that the Iraqi government

approved certain work for Intermediary Company's client companies, including,

but not limited to, SBM, Company 1, Company 5, Company 8, and Company 9.

50.     Specifically, in or around and between 2009 and 2010, Defendants

**C. AHSANI, S. AHSANI**, and others, including but not limited to CC-3, obtained

confidential bidding information from Iraq Official 2 identifying the scope of "Iraq

Project 1," a major oil and gas development project in Iraq that is known to the

United States and Defendants, and other information revealing the identity of the

likely bidders for related sub-projects, including "Iraq Project 1A," "Iraq Project

1B," and "Iraq Project 1C," sub-projects to Iraq Project 1 that are known to the

United States and Defendants.

17

51.     On or about May 26, 2010, CC-2 attended a meeting in Perth, Australia with employees of Company 8 and Company 9 in which they agreed to enter into a corrupt bid-rigging process. At the meeting, CC-2 agreed with certain employees of Company 8 and Company 9 that CC-2 would act as a go-between to share information between Company 8 and Company 9, so that Company 8 and Company 9 could adjust their bids to ensure that Company 8 won Iraq Project 1A and Company 9 won Iraq Project 1B. As part of the agreement, Company 8 and Company 9 also agreed to retain certain subsidiaries and affiliates of Intermediary Company as sub-contractors on the projects. Certain executives at Company 8 and Company 9 ensured that Intermediary Company's subsidiary and affiliated companies would be paid so that Intermediary Company had sufficient funds to make bribe payments to Iraqi government officials.

52.     On or about October 23, 2010, the government of Iraq awarded Iraq Project 1A to Company 8.

53.     Thereafter, Defendants **C. AHSANI** and **S. AHSANI**, and others, including certain executives and employees at Company 8 and Company 9, agreed to pay approximately $8.25 million to CC-7, portions of which they understood would be paid as bribes to Iraq Official 2, Iraq Official 3, and Iraq Official 4 in order to guarantee that the Iraqi government would approve Company 8's and

18

Company 9's project bids in a timely manner, and approve Intermediary

Company's subsidiary and affiliated companies as sub-contractors.

54.    In addition to the above, Defendants **C. AHSANI, S. AHSANI**, and

others, acting within the scope of their agency and other agreements and for the

benefit of Intermediary Company and Intermediary Company's client companies,

conspired with others, including certain client company executives and employees,

to pay bribes, promise to pay bribes, offer to pay bribes, and authorize the payment

of bribes to foreign government officials in Iraq, including within SOE-1 and SOE-

2, in order to obtain the following projects:

a.    In or around 2005, and in conspiracy with certain executives

and employees at Company 22, at least one project for Company 22.  In

furtherance of the conspiracy, Defendant **C. AHSANI** and others agreed to pay

kickbacks to an executive at Company 22;

b.    In or around and between 2008 and 2011, and in conspiracy

with certain executives and employees at Company 1, at least seven projects for

Company 1;

c.    In or around and between 2010 and 2013, and in conspiracy

with certain executives and employees of SBM, Iraq Project 1C and at least two

other sub-projects to Iraq Project 1 for SBM;

d.      In or around and between 2010 and 2014, and in conspiracy with certain executives and employees at Company 8, at least one sub-project to Iraq Project 1 for Company 8;

e.      In or around and between 2011 and 2013, at least one engineering and construction project for Intermediary Company;

f.      In or around and between 2013 and 2015, and in conspiracy with certain executives and employees at Company 5, an option to substitute Company 5 equipment in the project identified above in paragraph 54(e); and

g.      In or around 2015, and in conspiracy with certain executives and employees at Company 25, at least one maintenance management services project for Company 25.

Kazakhstan

55.      In Kazakhstan, Defendants **C. AHSANI** and **S. AHSANI** conspired with others, including certain executives and employees at client companies of Intermediary Company, to pay bribes, promise to pay bribes, offer to pay bribes, and authorize the payment of bribes to foreign government officials, including at SOE-3 and SOE-4, in order to obtain improper business advantages and to obtain and retain business for Intermediary Company and its co-conspirator client companies, including, but not limited to, Company 3, Company 4, Company 6, Company 7, Company 13, Company 14, Company 19, Company 20, and Company

21. Defendants **C. AHSANI** and **S. AHSANI** also conspired with others to engage in other corrupt conduct, such as bid-rigging, paying kickbacks, and laundering of the proceeds of the corrupt schemes.

56.     For example, by at least in or around 2001, Defendant **C. AHSANI** and others learned that the government of Kazakhstan would be seeking bids for various sub-projects on "Kazakhstan Project 1." At the time, Defendant **C. AHSANI** also learned that SOE-3 had appointed a consortium of large oil and gas services companies to assist with the bidding. Defendant **C. AHSANI** and others knew that SOE-4, as the operator of the project, evaluated bids made by the oil and gas companies and that SOE-4 made recommendations to SOE-3 for final approval of certain significant contract awards.

57.     In or around 2002, Company 3 retained Intermediary Company for work in Kazakhstan. In or before October 2002, Defendant **C. AHSANI** and others identified for certain Company 3 executives and employees "Kazakhstan Project 1A," a sub-project to Kazakhstan Project 1 that is known to the United States and Defendants, as a viable project for Company 3. In order to win that project, Defendant **C. AHSANI** conspired with others, including CC-2 and certain Company 3 executives, to bribe government officials in Kazakhstan in order to win "Kazakhstan Project 1A."

58.     Specifically, on or about December 31, 2004, Defendant **C. AHSANI**
promised to pay approximately $1.6 million to "Kazakh Official 1," a high-level
executive at SOE-4 whose identity is known to the United States and the
Defendants, in return for Kazakh Official 1's assistance with helping to award
Kazakhstan Project 1A to Company 3.  Although the promise to pay bribes
occurred while Kazakh Official 1 worked for SOE-4, Intermediary Company did
not make any payments to Kazakh Official 1 until Kazakh Official 1 stopped
working for SOE-4; Defendant **C. AHSANI** did, however, arrange for the
purchase of an automobile and furniture for Kazakh Official 1 while Kazakh
Official 1 was still employed by SOE-4.  Thereafter, in or about and between
February 2005 and October 2006, Defendant **C. AHSANI** and others caused
Intermediary Company to make payments to a company they knew was
beneficially owned and controlled by Kazakh Official 1, as had been promised, in
return for Kazakh Official 1's prior assistance in securing Kazakhstan Project 1A
for Company 3.

59.     Defendant **C. AHSANI** also conspired with others to bribe certain
officials at SOE-3 to ensure that Company 3 won Kazakhstan Project 1A.  For
example, on or about June 17, 2003, Intermediary Company entered into a sub-
agency agreement with a "sub-agent" company, in which Intermediary Company
agreed to pay the "sub-agent" approximately 0.44% of the value of the Kazakhstan

22

Project 1A contract award.  At the same time, Defendant **C. AHSANI** caused Intermediary Company to enter into a "side letter" agreement with the "sub-agent" providing that payments to the "sub-agent" would only continue if three specific government officials in Kazakhstan remained in their positions in the government. Defendant **C. AHSANI** and others executed this "side letter" because they understood that portions of Intermediary Company's payments to the "sub-agent" would be used to pay bribes to these three government officials in Kazakhstan.

60.     Defendant **C. AHSANI** further conspired with others to make bribe payments, including payments of cash and a vehicle, to "Kazakh Official 2," a high-ranking official at SOE-3 whose identity is known to the United States and Defendants, in exchange for Kazakh Official 2's agreement to use Kazakh Official 2's authority within SOE-3 to authorize the award of Kazakhstan Project 1A to Company 3.

61.     On or about May 26, 2004, the government of Kazakhstan awarded Kazakhstan Project 1A to Company 3.

62.     In addition to the above, Defendant **C. AHSANI**, and at times Defendant **S. AHSANI**, and others, acting within the scope of their agency and other agreements and for the benefit of Intermediary Company and Intermediary Company's client companies, conspired with others, including certain client company executives and employees, to pay bribes, promise to pay bribes, offer to

23

pay bribes, and authorize the payment of bribes to at least five foreign government officials in Kazakhstan, including within SOE-3 and SOE-4, in order to obtain the following additional projects:

a.      In or around and between 2003 and 2009, and in conspiracy with certain executives and employees at SBM, at least one sub-contract to Kazakhstan Project 1 for SBM and a joint venture partner;

b.      In or around and between 2003 and 2010, and in conspiracy with certain executives and employees at Company 7, at least seven sub-projects to Kazakhstan Project 1 and at least one other oil and gas project for Company 7. Among other things, Defendants **C. AHSANI**, **S. AHSANI**, and others also undertook affirmative steps to conceal the bribes paid and promised to be paid on behalf of Company 7, which included Defendant **S. AHSANI** coordinating with a high-ranking executive at Company 7 to maintain a double set of books and records to disguise Intermediary Company's bribery payments on behalf of Company 7 as legitimate transactions;

c.      In or around and between 2004 and 2006, and in conspiracy with certain executives and employees at Company 6, at least one sub-project to Kazakhstan Project 1 for Company 6;

24

d.      In or around and between 2004 and 2010, and in conspiracy with certain executives and employees at Rolls-Royce and Company 21, at least one sub-project to Kazakhstan Project 1 for Rolls-Royce and Company 21;

e.      In or around 2005, and in conspiracy with certain executives and employees at Company 4, at least one sub-project to Kazakhstan Project 1 for Company 4;

f.      In or around and between 2005 and 2008, and in conspiracy with certain executives and employees at Company 3, at least two additional sub-projects to Kazakhstan Project 1 for Company 3;

g.      In or around and between 2005 and 2008, and in conspiracy with certain executives and employees at Company 13, at least two sub-projects to Kazakhstan Project 1 for Company 13;

h.      In or around and between 2005 and 2010, and in conspiracy with certain executives and employees at Company 14, at least eight contracts in connection with a major oil and gas project in Kazakhstan for Company 14.  In furtherance of the conspiracy, Defendants **C. AHSANI** and **S. AHSANI** agreed amongst themselves and with others, including CC-6, to pay kickbacks to an executive at one of the companies in the Company 14 partnership;

i.      In or around and between 2006 and 2009, and in conspiracy with certain executives and employees at Company 19, at least one sub-project to

Kazakhstan Project 1 for a joint venture between Company 19 and another company; and

j.     In or around and between 2009 and 2013, and in conspiracy with certain executives and employees at Company 20, at least three sub-projects to Kazakhstan Project 1 for Company 20. In furtherance of the corrupt conspiracy, Defendants **C. AHSANI**, **S. AHSANI**, and others paid kickbacks to an executive at Company 20.

<u>Algeria</u>

63.     In Algeria, Defendants **C. AHSANI** and **S. AHSANI** conspired with others, including certain executives and employees at client companies of Intermediary Company, to pay bribes, promise to pay bribes, offer to pay bribes, and authorize the payment of bribes to foreign government officials, including at SOE-5, in order to obtain improper business advantages and to obtain and retain business for Intermediary Company and its co-conspirator client companies, including, but not limited to, Company 2, Company 15, Company 16, and Company 18. Defendants **C. AHSANI** and **S. AHSANI** also conspired with others to engage in other corrupt conduct such as bid-rigging, paying kickbacks, and laundering the proceeds of the corrupt schemes.

64.     For example, beginning by at least in or around November 2010, executives at Company 2 contacted executives of Intermediary Company about

assistance for work in Algeria.  In or about early 2011, Defendant **C. AHSANI**
received a "panicked" phone call from a Company 2 executive who said that the
Company 2 executive had promised to pay one or more individuals who had
assisted Company 2 in obtaining a contract from SOE-5.  The Company 2
executive told Defendant **C. AHSANI** that Company 2 needed to make this
payment, and that if the payment were not made, Company 2 would have
"problems" with the SOE-5 contract.  The Company 2 executive asked Defendant
**C. AHSANI** if Intermediary Company would agree to make the payment on behalf
of Company 2.   Defendant **C. AHSANI** believed that the Company 2 executive
was asking him to pay a bribe.

65.    In or around June 2011, Defendants **C. AHSANI**, **S. AHSANI**, and
others caused Intermediary Company to enter into a "Sales Consultant Agreement"
with Company 2.  As part of the arrangement, Defendant **C. AHSANI** agreed with
others, including two executives of Company 2, that Company 2 would pay
$300,000 to Intermediary Company, and that Intermediary Company would
perform no services for Company 2, except that Intermediary Company would pass
on a portion of the $300,000 payment to a shell company that had itself performed
no work for Intermediary Company or Company 2.

66.    On or about February 22, 2012, Company 2 transferred $300,000
from a bank account in Belgium, through a correspondent account in the United

27

States, on to an Intermediary Company bank account in Monaco. In or about and

between October 25, 2012 and December 31, 2012, Defendants **C. AHSANI** and

**S. AHSANI** caused Intermediary Company to transfer approximately $170,000

from an Intermediary Company bank account in the United Arab Emirates, through

a correspondent account in the United States, on to the shell company bank

account in the United Kingdom.

67.     In addition to the above, Defendants **C. AHSANI, S. AHSANI**, and

others, acting within the scope of their agency and other agreements and for the

benefit of Intermediary Company and Intermediary Company's client companies,

conspired with others, including certain client company executives and employees,

to pay bribes, promise to pay bribes, offer to pay bribes, and authorize the payment

of bribes to government officials in Algeria, including within SOE-5, in order to

obtain the following additional projects:

        a.      In or around 2008, and in conspiracy with certain executives

and employees at Company 15, Company 16, and Company 17, in order to win

certain projects for Company 15 and Company 16. Among other things,

Defendants **C. AHSANI, S. AHSANI**, and others, conspired with executives at

Company 15, Company 16, and Company 17 to rig the bid on the two projects to

ensure that Company 15 won one project and that Company 16 won the other. In

furtherance of this agreement, Defendants **C. AHSANI, S. AHSANI**, and others,

paid Company 17 to compensate Company 17 for deliberately losing the bid; and paid kickbacks to an executive of Company 15 and paid kickbacks to a consultant for Company 17; and

        b.     In or around and between 2009 and 2014, and in conspiracy with certain executives and employees of Company 18, in order to obtain certain contracts supplying spare parts to SOE-5 for Company 18. In furtherance of this and other schemes, Defendants **C. AHSANI**, **S. AHSANI**, and others paid kickbacks to an executive of Company 18.

Libya

      68.     In Libya, Defendants **C. AHSANI** and **S. AHSANI**, conspired with others, including certain executives and employees at client companies of Intermediary Company, to pay bribes, promise to pay bribes, offer to pay bribes, and authorize the payment of bribes to foreign government officials in Libya, including at SOE-6, in order to obtain improper business advantages and to obtain and retain business for Intermediary Company and its co-conspirator client companies, including, but not limited to, Company 10, Company 11, Company 12, Company 23, and Company 24. Defendants **C. AHSANI** and **S. AHSANI** also conspired with others to engage in other corrupt conduct such as paying kickbacks to executives and laundering the proceeds of the corrupt bribery and kickback schemes.

29

69.     For example, in or around May 2006, Company 10 entered into an "Agency Agreement" appointing Intermediary Company as its agent in attempting to secure the award of "Libya Project 1," a design and construction project that is known to the United States and Defendants.  Thereafter, Defendant **S. AHSANI** conspired with others, including CC-5, to promise to pay "Libya Official 1," an individual whose identity is known to the United States and the Defendants, in exchange for Libya Official 1's agreement to assist Intermediary Company and Company 10 in obtaining the contract award for Libya Project 1.  While Defendant **S. AHSANI**, CC-5, and others understood that Libya Official 1 was not an appointed Libyan government official at the time they promised to pay Libya Official 1, Defendant **S. AHSANI**, CC-5, and others, believed Libya Official 1 could exert influence over senior Libyan government officials, including one official who was a close relative of the then-head of the Libyan government, and that this senior Libya official's support or lack of support could determine whether Company 10 and its subsidiaries won the award for Libya Project 1.  At the time, Defendants **C. AHSANI** and **S. AHSANI** also agreed to pay the bribe because they understood that Libya Official 1 could potentially use Libya Official 1's influence to steer other Libyan government contracts to Intermediary Company and its co-conspirator clients.

30

70.    In or around October 2006, the Libyan government awarded Libya Project 1 to Company 10.

71.    After Libya Project 1 was awarded to Company 10, and in furtherance of the corrupt arrangement, Defendants **C. AHSANI, S. AHSANI**, and others paid $250,000 to a shell company they believed to be held in the name of a relative of Libya Official 1, who by this time had an official title in the Libyan government.

72.    Later, in or around 2009, Company 10 and Intermediary Company had a contract dispute, which led Company 10 to stop making contractual payments.  In order to induce Company 10 to continue their payments to Intermediary Company, Defendants **C. AHSANI** and **S. AHSANI** agreed to pay two executives at Company 10 kickbacks valued at approximately $100,000 each.

73.    In addition to the above, Defendants **C. AHSANI** and **S. AHSANI**, acting within the scope of their agency and other agreements and for the benefit of Intermediary Company and Intermediary Company's client companies, conspired with others, including certain client company executives and employees, to pay bribes, promise to pay bribes, offer to pay bribes, and authorize the payment of bribes to government officials in Libya, including at SOE-6, in order to obtain the following additional projects:

31

a.  In or around and between 2008 and 2011, and in conspiracy with certain executives at Company 23 and Company 24, at least one project for Company 23 and Company 24;

b.  In or around and between 2009 and 2010, and in conspiracy with certain executives and employees at Company 12, at least one project for Company 12.  In furtherance of the corrupt conspiracy, Defendants **C. AHSANI** and **S. AHSANI**, and others, paid kickbacks to an executive at Company 12; and

c.  In or around 2010, and in conspiracy with certain executives and employees at Company 11, at least one project for Company 11.

<u>Concealment and Obstruction</u>

74.  Beginning in or around 2006 and continuing until in or around 2016, Defendants **C. AHSANI** and **S. AHSANI** conspired with others to conceal the ongoing bribery and money laundering schemes on behalf of Intermediary Company and its co-conspirator client companies.  Among other things, Defendants **C. AHSANI, S. AHSANI**, and others used code words when communicating with others about the corrupt scheme, made false statements over international wires to the United States to obtain necessary compliance certifications, caused false statements to be made in official proceedings, and took efforts to conceal the discovery of incriminating information by law enforcement in the United States and elsewhere.

32

75.     For example, Defendants **C. AHSANI** and **S. AHSANI** conspired
with others to make false statements, through interstate and international wire
communications, to "Due Diligence Organization," an anti-bribery organization
headquartered in the United States whose identity is known to the United States
and the Defendants.  Due Diligence Organization offered companies due diligence
services, including screenings and certifications, which were designed to signal
whether a company had met certain anticorruption standards.

76.     Beginning in or around 2006, Rolls-Royce's compliance department
initiated a new control that required all sales agents to undergo Due Diligence
Organization's screening and obtain a compliance certification.  In order to obtain
Due Diligence Organization's certification and continue doing business with Rolls-
Royce and RRESI, Defendants **C. AHSANI**, **S. AHSANI**, and others agreed to
cause materially false and misleading information to be transmitted, through
interstate and international wire, to Due Diligence Organization in the United
States, including false statements that Intermediary Company was not involved in
the payment of bribes to foreign government officials.  Further, Defendants
**C. AHSANI**, **S. AHSANI**, and others provided Due Diligence Organization with
business references, including executives at Company 3, Company 7, and
Company 18, who knew that Intermediary Company paid bribes to win business
for Company 3, Company 7, and Company 18, respectively.  Defendants

33

**C. AHSANI, S. AHSANI**, and others caused Intermediary Company to submit false statements so that Intermediary Company could continue to maintain Due Diligence Organization's certifications until at least in or around 2015.

77.    Additionally, in or around June and July of 2011, Defendant **C. AHSANI, S. AHSANI**, and others learned that a foreign law enforcement agency had begun investigating a co-conspirator.  In response, Defendants **C. AHSANI, S. AHSANI**, and others caused over 250,000 potentially incriminating emails and other documents on Intermediary Company's system to be archived.   Thereafter, Defendants **C. AHSANI, S. AHSANI**, and others caused the archived documents to be relocated from Intermediary Company's offices in Monaco to Lebanon and the United Arab Emirates.

78.    On or about March 29, 2016, several media outlets began reporting that Defendants **C. AHSANI, S. AHSANI**, and others had participated in a long-running bribery scheme at Intermediary Company, and the news reports included excerpts from the archived documents identified in Paragraph 77.  The Defendants learned that multiple law enforcement agencies, including law enforcement in the United States, were conducting investigations into Intermediary Company's bribery scheme.  Thereafter, in or around the summer of 2016, Defendants **C. AHSANI, S. AHSANI**, and others destroyed incriminating documents with the

intent to prevent their discovery by law enforcement agents in the United States, the United Kingdom, Australia, and elsewhere.

## COUNT ONE
### (Conspiracy)

79.     The allegations set forth in paragraphs 1 through 78 of this Information are repeated and realleged as if fully set forth herein.

80.     Beginning by at least in or around 1999 and continuing through at least in or around 2016, in the Southern District of Texas and elsewhere, the Defendants,

**CYRUS ALLEN AHSANI,**

and

**SAMAN AHSANI,**

did, knowingly and willfully, that is, with the intent to further the objects of the conspiracy, conspire, confederate, and agree with others, including Intermediary Company, CC-1, CC-2, CC-3, CC-4, CC-5, CC-6, CC-7, Intermediary Company's client companies and certain of their executives and employees, including at Rolls-Royce, RRESI, SBM, Company 1, Company 2, Company 3, Company 4, Company 5, Company 6, Company 7, Company 8, Company 9, Company 10, Company 11, Company 12, Company 13, Company 14, Company 15, Company 16, Company 17, Company 18, Company 19, Company 20, Company 21,

35

Company 22, Company 23, Company 24, and Company 25, and others known and unknown, to commit offenses against the United States, that is:

      a.     being an agent of an issuer, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Company 1, Company 2, Company 3, Company 4, the parent company of Company 5, Company 6, Company 21, Company 24, and others known and unknown, in obtaining and retaining business for and with, and directing business to, Intermediary Company, Company 1, Company 2, Company 3, Company 4, Company 5 and its parent company,

Company 6, Company 21, Company 23, Company 24, and others known and unknown, in violation of the FCPA, Title 15, United States Code, Section 78dd-1;

      b.    being an agent of a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist RRESI, Company 22, Company 23 and others known and unknown, in obtaining and retaining business for and with, and directing business to, Intermediary Company, Rolls-Royce, RRESI, Company 22, Company 23, Company 24, and others known and unknown, in violation of the FCPA, Title 15, United States Code, Section 78dd-2;

37

c.      while in the territory of the United States, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Rolls-Royce, SBM, Company 7, Company 8, Company 9, Company 10, Company 11, Company 12, Company 13, Company 14, Company 15, Company 16, Company 17, Company 18, Company 19, Company 20, Company 25 and others known and unknown, in obtaining and retaining business for and with, and directing business to, Intermediary Company, Rolls-Royce, RRESI, SBM, Company 7, Company 8, Company 9, Company 10, Company 11, Company 12, Company 13, Company 14, Company 15, Company 16, Company 17, Company 18, Company 19,

Company 20, Company 25, and others known and unknown, in violation of the

FCPA, Title 15, United States Code, Section 78dd-3;

      d.    transporting, transmitting, transferring, and attempting to

transport, transmit, and transfer, monetary instruments from a place in the United

States to or through a place outside the United States, or to a place in the United

States from or through a place outside the United States, with the intent to promote

the carrying on of a specified unlawful activity, as defined in Title 18, United

States Code Section 1956(c)(7), in violation of Title 18, United States Code,

Section 1956(a)(2)(A);

      e.    transporting, transmitting, transferring, and attempting to

transport, transmit, and transfer, monetary instruments from a place in the United

States to or through a place outside the United States, or to a place in the United

States from or through a place outside the United States, knowing that the

monetary instrument or funds involved in the transportation, transmission, or

transfer represent the proceeds of some form of unlawful activity and knowing that

such transportation, transmission, or transfer is designed, in whole or in part, to

conceal or disguise the nature, the location, the source, the ownership, or the

control of the proceeds of specific unlawful activity, as defined in Title 18, United

States Code Section 1956(c)(7), in violation of Title 18, United States Code,

Section 1956(a)(2)(B)(i); and

f.       knowingly altering, destroying, mutilating, concealing, covering up, falsifying, and making false entries in any record, document, or tangible object with the intent to impede, obstruct, or influence criminal investigations into Defendants **C. AHSANI, S. AHSANI**, Intermediary Company, and others known and unknown, a matter within the jurisdiction of the U.S. Department of Justice, in violation of Title 18, United States Code, Section 1519.

### Purpose of the Conspiracy

81.    The purpose of the conspiracy was for Defendants **C. AHSANI, S. AHSANI**, and their co-conspirators, to enrich themselves, Intermediary Company, Intermediary Company's client companies, and others, by, among other things, making corrupt bribe and kickback payments to foreign officials, so that Intermediary Company and its co-conspirator clients would obtain and retain lucrative contracts, to launder the proceeds of the corrupt bribery and kickback schemes in order to promote and conceal the ongoing schemes, and to falsify and destroy records to avoid detection and prosecution by law enforcement in the United States and elsewhere.

### Manner and Means of the Conspiracy

82.    The manner and means by which Defendants **C. AHSANI, S. AHSANI**, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

40

83.     Defendants **C. AHSANI** and **S. AHSANI**, together with their co-conspirators, communicated in person, via email, telephone, and fax machine, the need, agreement and manner to pay bribes to foreign officials in order to obtain and retain improper business advantages and lucrative contract awards from foreign governments, agencies and instrumentalities for Intermediary Company and its co-conspirator client companies.

84.     Defendants **C. AHSANI** and **S. AHSANI**, together with their co-conspirators, obtained confidential bidding and other inside information from within foreign governments, agencies and instrumentalities, and used, disseminated, and discussed the contents of that information with others at Intermediary Company and its co-conspirator client companies, in order to obtain improper advantages and lucrative contract awards for Intermediary Company and its co-conspirator client companies.

85.     Defendants **C. AHSANI** and **S. AHSANI**, together with their co-conspirators, solicited energy, engineering and construction companies operating in the energy sector to retain Intermediary Company's services by describing their "proximity" to foreign officials, and their ability to obtain inside confidential bidding information.

86.     Defendants **C. AHSANI** and **S. AHSANI**, together with their co-conspirators, used code words, maintained multiple versions of books and

41

records within Intermediary Company, and structured bribe and kickback payments through multiple affiliates and subsidiary companies of Intermediary Company in order to promote and conceal the ongoing bribery and kickback scheme from detection by law enforcement and others.

87.     Defendants **C. AHSANI** and **S. AHSANI**, together with their co-conspirators, negotiated corrupt kickback payments with certain foreign officials and executives and employees at their co-conspirator client companies in order to obtain or retain business for Intermediary Company and its co-conspirator client companies.

88.     Defendants **C. AHSANI** and **S. AHSANI**, together with their co-conspirators, maintained original and copies of incriminating documents offsite in other locations than Intermediary Company's office location in Monaco or their residences, in order to conceal their discovery by law enforcement and others.

89.     Defendants **C. AHSANI** and **S. AHSANI**, together with their co-conspirators, destroyed original and copies of incriminating documents, including destroying flash drives and paper records, in order to conceal their discovery by law enforcement and others.

90.     Defendants **C. AHSANI** and **S. AHSANI**, together with their co-conspirators, made false and misleading statements and omissions, including in communications by wire to Due Diligence Organization in order to obtain

compliance certifications that was used to circumvent certain client companies'

compliance functions and to facilitate business transactions with them.

## Overt Acts

91.     In furtherance of the conspiracy and to achieve the objects thereof, at

least one of the co-conspirators committed or caused to be committed, in the

Southern District of Texas and elsewhere, at least one of the following overt acts,

among others:

92.     On or about June 17, 2003, Defendant **C. AHSANI** and others caused

Intermediary Company to enter into an agreement with a "sub-agent" to pay the

"sub-agent" approximately 0.44% of the value of the Kazakhstan Project 1A.

93.     On or about June 17, 2003, Defendant **C. AHSANI** and others caused

Intermediary Company to enter into a "side letter" agreement with the "sub-agent"

in Kazakhstan mandating that payments to the "sub-agent" on Kazakhstan

Project 1A would continue only if three named government officials remained in

their official positions in Kazakhstan.

94.     On or about November 15, 2004, Defendant **C. AHSANI** sent an

email, through interstate and international wire, to an employee at Intermediary

Company, in which he explained the need to arrange a bribe payment to Kazakh

Official 2 on behalf of Company 3, "we need to arrange 10K for [Kazakh

Official 2] to take to kaz. by the 23 Nov between [CC-2] and myself.  Also kindly

get the details of [CC-1's] acct for the 200k dollars to send to him tomorrow."

95.     On or about February 15, 2005, Defendants **C. AHSANI**,

**S. AHSANI**, and others caused Intermediary Company to transfer approximately

$300,000 from an Intermediary Company bank account in Monaco, through a

correspondent bank account in the United States, on to a bank account in

Switzerland that was beneficially owned and controlled by Kazakh Official 1.

96.     On or about March 16, 2005, Defendants **C. AHSANI, S. AHSANI**,

and others caused Intermediary Company to transfer approximately $100,000 from

an Intermediary Company bank account in Monaco, through a correspondent bank

account in the United States, on to a bank account in Latvia that was beneficially

owned and controlled by an Intermediary Company "sub-agent" in Kazakhstan and

which would be used to conceal a bribe payment.

97.     On or about and between March 29 and March 31, 2005, Defendant

**C. AHSANI** and CC-1 traveled to Houston, Texas, in the Southern District of

Texas, in order to meet with executives at co-conspirator companies, including

Company 3 and Company 4, and to solicit business from prospective client

companies seeking to obtain contracts in Kazakhstan.

98.     On or about October 3, 2005, Defendants **C. AHSANI, S. AHSANI**,

and others caused Intermediary Company to transfer approximately $2 million

from an Intermediary Company bank account in Switzerland, through a correspondent bank account in the United States, on to a shell company bank account in Hong Kong, with the understanding that at least a portion of the funds would be used to pay a bribe to a senior Kazakh official for that official's assistance in helping Company 7 obtain and retain business in Kazakhstan.

99.    On or about August 17, 2005, Defendants **C. AHSANI**, **S. AHSANI**, and others caused Intermediary Company to transfer approximately $136,500 from an Intermediary Company bank account in Switzerland to a bank account in the United States, knowing at least a portion of the funds would be used to pay a bribe to a foreign official to help Company 7 obtain and retain business in Kazakhstan.

100.    On or about April 13, 2006, Defendant **C. AHSANI** sent an email, through interstate and international wire, to an executive of Company 7, copying Defendant **S. AHSANI**, asking the Company 7 executive to serve as a reference for Intermediary Company's certification review by Due Diligence Organization, even though Defendants **C. AHSANI**, **S. AHSANI**, and the Company 7 executive knew that Intermediary Company paid bribes on behalf and for the benefit of Company 7.

101.    On or about May 24, 2006, Defendants **C. AHSANI**, **S. AHSANI**, and others caused Intermediary Company to enter into an "Agency Agreement"

with Company 10, which authorized Intermediary Company to assist in negotiating with the Libyan government and securing the award of Libya Project 1.

102.   On or about July 17, 2006, CC-2 sent an email, through interstate and international wire, to Defendant **C. AHSANI** explaining that Intermediary Company owed an Italy-based "sub-agent" for bribes paid to a government official in SOE-4 on behalf of Rolls-Royce, writing, "We owe [the sub-agent] 56K from Dec last year and another 154K recently paid from Rolls . . . ."

103.   On or about February 16, 2007, Defendants **C. AHSANI**, **S. AHSANI**, and others caused Intermediary Company to transfer approximately $191,400 from an Intermediary Company bank account in Switzerland, through a correspondent bank account in the United States, on to a bank account in the United Kingdom, with the intention that a portion of the funds would be used to pay a bribe to a foreign official on behalf of and for the benefit of Company 6.

104.   On or about May 18, 2008, CC-3 sent an email, through interstate and international wire, to Defendant **C. AHSANI** and CC-4 to explain that he had met with Iraq Official 2, who was then a high-level official at SOE-1, and discussed Iraq Official 2's "future position with [Intermediary Company]." CC-3 went on to explain that at the meeting Iraq Official 2 indicated that the government of Iraq was preparing to bid Iraq Project 1.

105. On or about June 7, 2008, Defendant **C. AHSANI** caused an employee of Intermediary Company to sign a "Service Agreement" with Company 16, the terms of which required Company 16 to pay Intermediary Company a 2.1 percent commission on a project in Algeria.

106. On or about September 1, 2008, Defendant **C. AHSANI** signed a "Consultancy Agreement" with Company 15, the terms of which required Company 15 to pay Intermediary Company a $13 million fee for assistance in obtaining a project in Algeria.

107. On or about February 6, 2009, an executive at Company 18, who was aware that Intermediary Company was paying bribes on behalf of Company 18 and receiving kickback payments from Intermediary Company, executed a Business Reference, in which the executive wrote, "[Intermediary Company's] Business Ethics and reputation is among all their Peers of the highest standard" and "To my knowledge . . . there is no family nor financial ties between any [Intermediary Company] employee, managers, owner and any government agencies/officials." The executive at Company 18 then caused this business reference to be emailed, through interstate and international wire, to Due Diligence Organization.

108. On or about February 26, 2009, CC-3 forwarded an email, through interstate and international wire, that CC-3 received from Iraq Official 2, to Defendant **C. AHSANI** and CC-4. The email included confidential information

from SOE-1, including a draft vendor list for various Iraqi projects, including Iraq

Project 1B and Iraq Project 1C.  In the email, CC-3 explained, "We have one week

to add [or] subtract to th[is] list and return it to our friend."

109.   On or about May 15, 2009, CC-3 sent an email, through interstate and

international wire, to Defendant **C. AHSANI** containing confidential SOE-1

documents, including competitive bidding information on Iraq Project 1C, which

CC-3 had received earlier that day from Iraq Official 2.  In the email, CC-3

instructed that Defendant **C. AHSANI** should "give it confidentially to SBM . . . ."

110.   On or about May 17, 2009, CC-3 sent an email, through interstate and

international wire, to Defendant **C. AHSANI** discussing a proposal to pay a

regular bribe to Iraq Official 2 as a "retainer":

> It is $6000 per month. ($5K for [Iraq Official 2], and $1K [Iraq Official
> 2] needs for presents to people within)[.]  I think this will only go on as
> far as we get commitments firmed up and [Iraq Official 2] knows [Iraq
> Official 2's] portion.

> Similarly if [Iraq Official 2] leaves this position it stops.

111.   In or around June 2009, Defendants **C. AHSANI, S. AHSANI**, and

others caused a corrupt payment of approximately $250,000 to be made to a

relative of Libya Official 1.

112.   On or about July 23, 2009, Defendants **C. AHSANI, S. AHSANI**, and

others caused Intermediary Company to enter into a "Settlement Agreement" with

Company 10.

113. On or about July 27, 2009, Defendant **S. AHSANI** caused Intermediary Company to transfer approximately $100,000 from an Intermediary Company bank account in Monaco, through a correspondent bank account in the United States, on to a bank account in the United Arab Emirates that was beneficially owned and controlled by an executive at Company 10.

114. On or about and between August 10, 2009, and August 16, 2009, CC-2 traveled to Houston, Texas in the Southern District of Texas, in order to meet with executives at co-conspirator companies, including Company 6, and solicit business from prospective client companies seeking to obtain contracts in Iraq.

115. On or before August 18, 2009, CC-3 met with CC-7 in Amman, Jordan to discuss CC-7 working as a "sub-agent" for Intermediary Company.

116. On or about September 24, 2009, Defendant **S. AHSANI** sent an email, through interstate and international wire, to Defendant **C. AHSANI** and another to coordinate payments to Company 17 for fictitious engineering services, but which were in fact compensation for Company 17's agreement to voluntarily lose bids in Algeria to Company 15 and Company 16.

117. On or about and between May 2, 2010, and May 6, 2010, CC-4 and other Intermediary Company employees traveled to the Offshore Technology Conference in Houston, Texas in the Southern District of Texas, in order to meet with executives at co-conspirator companies, including SBM and Company 2, and

to solicit business from prospective client companies seeking to obtain contracts in Libya and Iraq.

118.   On or about May 26, 2010, CC-2 traveled to Perth, Australia, and met with certain executives at Company 8 and Company 9, where they agreed to rig the bidding process for projects in Iraq.

119.   On or about August 25, 2010, Defendants **C. AHSANI**, **S. AHSANI**, and others caused Intermediary Company to enter into a consultancy agreement with CC-7, which included paying CC-7 approximately $4.5 million for, among other things, "facilitating to get [Iraq Project 1A] order for [Company 8]."

120.   On or about December 30, 2010, Defendants **C. AHSANI**, **S. AHSANI**, and others caused Intermediary Company to transfer approximately $1,000,000 from an Intermediary Company bank account in Monaco, through a correspondent bank account in the United States, to a company bank account in Jordan that was beneficially owned and controlled by CC-7.

121.   On or about January 18, 2011, Defendant **S. AHSANI** signed a "Sales Consultant Agreement" on behalf of Intermediary Company agreeing to pay CC-7 approximately $16 million in order to obtain a project in Iraq for Company 8.

122.   On or about February 6, 2011, an Intermediary Company employee sent an email, through interstate and international wire, to Defendant **S. AHSANI**, CC-5, and another concerning the bribe payment structure for a project Company

23 won with SOE-6, "[CC-5] has agreed to pay half (0.5%) now and the rest when

the project has been completed and all the monies have been rewarded. We have

prepped a cash call for the next two months for the Libya office and I suppose it's

practical to get this payment involved as well."

123.   On or about March 28, 2011, an Intermediary Company employee

sent an email, through interstate and international wire, to Defendant **C. AHSANI**,

"Further to our discussion and for your information, please find below the details

of the co [Company 2] want us to sign with." The email included bank account

details for a shell company that performed no work for Intermediary Company or

Company 2.

124.   On or about July 1, 2011, Defendant **S. AHSANI** signed a "Sales

Consultant Agreement" on behalf of Intermediary Company with Company 2.

125.   On or about July 11, 2011, Defendants **C. AHSANI, S. AHSANI**, and

CC-1 generated a spreadsheet designed to identify certain areas of possible

criminal exposure. This spreadsheet identified bribes and other corrupt payments

made on behalf of Company 3, Company 6, Company 7, Company 8,

Company 10, Company 11, Company 13, Company 14, Company 15,

Company 17, Company 18, Company 19, Company 20, and Company 22, among

others. Concerning payments to CC-7, the entry in the spreadsheet was

highlighted in red and read "Major Exposure – [CC-1] to talk to [CC-3]."

51

126. On or about August 18, 2011, while in the United States with CC-3 and CC-5, Defendant **S. AHSANI** and CC-3 spoke by telephone, through interstate and international wire, with Defendant **C. AHSANI** concerning making a payment to CC-6 related to the project with Company 8.

127. On or about September 16, 2011, Defendants **C. AHSANI**, **S. AHSANI**, and others caused Intermediary Company to transfer approximately $500,000 from an Intermediary Company bank account in Monaco, through a correspondent bank account in the United States, to a company bank account in Jordan that was beneficially owned and controlled by CC-7.

128. On or about October 19, 2011, Defendant **S. AHSANI** signed a "Binding Contract" on behalf of a subsidiary of Intermediary Company agreeing to pay CC-7 approximately $3.25 million for purported "engineering" services, but which was, in fact, to be used to make bribe payments to Iraqi officials in order to obtain an engineering and construction project for Intermediary Company.

129. On or about and between April 9 and April 11, 2012, CC-2 traveled to Houston, Texas in the Southern District of Texas, in order to in order to meet with executives at co-conspirator companies, including Company 6, and to solicit business from prospective client companies seeking to obtain contracts in Kazakhstan, Azerbaijan, and Libya.

52

130.   On or about October 25, 2012, Defendants **C. AHSANI**, **S. AHSANI**, and others caused Intermediary Company to transfer approximately $70,000 from an Intermediary Company bank account in the United Arab Emirates, through a correspondent bank account in the United States, on to a bank account of a shell company that was controlled by the "sub-agent" a Company 2 executive had told Defendant **C. AHSANI** to pay in connection with Company 2's contract with SOE-5 for a project in Algeria.

131.   On or about December 6, 2013, Defendant **S. AHSANI** conspired with others to send an email, through interstate and international wire, to a U.S.-based employee of Due Diligence Organization, containing the following materially false statement: "I certify that to the best of my knowledge, neither [Intermediary Company] nor any of its employees or third parties acting on its behalf have offered or given anything of value to a government official in order to obtain or retain business or receive an improper business advantage."

132.   On or about September 4, 2014, Defendant **S. AHSANI** signed a "Memorandum of Understanding" with Company 25 on behalf of Intermediary Company, in which the parties agreed to establish a joint venture and jointly bid for a maintenance management services project in Iraq.

133.   On or about October 23, 2014, an executive of Intermediary Company emailed, through interstate and international wire, Defendant **S. AHSANI** and

53

executives of Company 25, discussing a two percent bribe to be paid to Iraq Official 1, "We need to transfer the . . . 2% (8% to 10%) by increasing by 2% the contingencies on security." On or about the same date, an executive of Company 25 sent a responsive email, through interstate and international wire, to Defendant **S. AHSANI**, executives of Intermediary Company, and executives of Company 25, proposing to meet to discuss the "cost model," and suggesting an alternative structure, "[o]r we agree to keep these 2% in one pot, to be discussed with [another Company 25 executive.]"

134.   On or about January 14, 2015, Defendant **C. AHSANI** and **S. AHSANI** and executives of Company 25 caused the execution of a "Master Agreement" for a maintenance management services project in Iraq.

135.   In or around April 2016, after learning from public news sources that Intermediary Company was under investigation by the United States and foreign law enforcement, Defendants **C. AHSANI** and **S. AHSANI** caused incriminating documents to be destroyed.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. §§ 981(a)(1)(C) & 982(a)(1))

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), the United States gives notice to the Defendants,

**CYRUS ALLEN AHSANI,**

and

**SAMAN AHSANI,**

that in the event of conviction, the United States intends to seek forfeiture of (a) all property, real or personal, which constitutes or is derived from proceeds traceable to the criminal offense; and (b) all property, real or personal, involved in money laundering or traceable to such property.

## MONEY JUDGMENT AND SUBSTITUTE ASSETS

The United States gives notice that it will seek a money judgment against each Defendant. In the event that one or more conditions listed in Title 21, United States

Code, Section 853(p) exist, the United States will seek to forfeit any other property

of each Defendant up to the amount of the money judgment.

RYAN K. PATRICK                                ROBERT A. ZINK
United States Attorney                          Acting Chief, Fraud Section
Southern District of Texas                      Criminal Division
                                                Department of Justice

BY:   _____        BY:   _____
            SUZANNE ELMILADY                      DENNIS R. KIHM
            Assistant United States Attorney      GERALD M. MOODY, JR.
                                                  JONATHAN ROBELL
                                                  GWENDOLYN STAMPER
                                                  Trial Attorneys